AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Johnny Quenga | ) | Case No. |
| | ) | |
| | ) | 1:15 MJ 00033 BAM |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____March 5, 2015____ in the county of ____Fresno____ in the ____Eastern____ District of ____California____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 32(a)(5) and (a)(8); and | Attempting to interfere with the safe operation of an aircraft; Penalty: 20 years in prison/$250,000 fine/$100 penalty assessment/3 year TSR; and |
| 18 U.S.C. § 39A | Aiming the beam of a laser pointer at an aircraft or its flight path; Penalty: 5 years in prison/$250,000 fine/$100 penalty assessment/3 year TSR. |

This criminal complaint is based on these facts:

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Johnnie R. Santiago, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/6/15

_____
*Judge's signature*

City and state: Fresno, California

Barbara A. McAuliffe, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ISSUANCE OF ARREST WARRANT

I, Johnnie R. Santiago, a Special Agent (SA) with the Federal Bureau of Investigation (FBI), Sacramento Division, being duly sworn, depose and state as follows:

## A. Agent's Expertise

1. I have been employed as a Special Agent of the FBI since August 1987, and am currently assigned to the Sacramento Division, Fresno Resident Agency (RA). As a Special Agent of the FBI, I investigate federal criminal violations related to violent crimes, including violations of Title 18, United States Code, Sections 32(a)(5) and (a)(8), attempting to interfere with the safe operation of an aircraft, and Section 39A, aiming the beam of a laser pointer at an aircraft or its flight path. During my years as a Special Agent, I have investigated crimes related to Counterterrorism, Domestic Terrorism, Drug Trafficking, Kidnapping, Bank Robbery, Extortion and Fugitives. I have gained knowledge and experience through training at the FBI academy and over 27 years of everyday work related to these investigations.

2. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute arrest warrants issued under the authority of the United States. I have educated myself regarding laser cases by reading articles posted on the internet and by reviewing past cases investigated by the FBI. I have used hand held laser pointing devices and laser levels used in construction work in professional and personal applications. I also know there is a requirement for laser devices to have a danger warning label printed and affixed on all laser devises, and operating instructions accompanying laser devices that I have seen or reviewed, including instructions to avoid exposing lasers to eyes as the laser could cause serious injury to the eye.

////

////

### B. Nature of Affidavit

3. This Affidavit is based upon my own personal knowledge of the events set forth herein, as well as information provided to me by other law enforcement personnel. The purpose of this affidavit is to support a complaint charging JOHNNY QUENGA with violating Title 18, United States Codes, Sections 32(a)(5) and (a)(8), attempting to interfere with the safe operation of an aircraft, and Title 18, United States Code, Section 39A, aiming the beam of a laser pointer at an aircraft or its flight path. My knowledge of the underlying investigation is derived from interviews of contacts, victims, potential witnesses and/or suspects, my review of law enforcement reports prepared in this case, and discussion of this case with assisting agents and/or officers. I have detailed only the facts that I believe are necessary and appropriate to establish the probable cause mandatory for an authorization of the arrest of the subject identified hereinafter.

### C. Statutory Authority

4. Section 32(a)(5) of Title 18 prohibits willfully interfering with or disabling, with intent to endanger the safety of any person or with a reckless disregard for the safety of human life, anyone engaged in the operation of an aircraft in the special aircraft jurisdiction of the United States. The term "special aircraft jurisdiction of the United States" includes any civil aircraft of the United States, any aircraft of the armed forces of the United States, or another aircraft in the United States. 49 U.S.C. § 46501(2). Section 32(a)(8) of Title 18 criminalizes attempts to do the foregoing.

5. Section 39A of Title 18 of the United States Code prohibits knowingly aiming the beam of a laser pointer at an aircraft or its flight path. A laser pointer is defined as "any device designed or used to amplify electromagnetic radiation by stimulated emission that emits a beam designed to be used by the operator as a pointer or highlighter to indicate, mark, or identify a specific position, place, item, or object." 18 U.S.C. § 39A(b).

////

### D. Facts in Support of Probable Cause Determination

6. On March 5, 2015, at 11:07 p.m.,[1] during routine patrol, Fresno Police Department (FPD) aircraft Air 1 were flying at cruise altitude, at approximately 500 feet above ground level, when it was struck through the left and back cockpit window with a green laser approximately six times over a period of about ten minutes. The beam of light caused FPD Tactical Flight Officer (TFO) Jeffrey Logue to experience temporary flash blindness, after imaging, a persistent headache lasting several hours requiring pain medication, and dizziness. TFO Logue has been struck numerous times in the past by green laser beams while serving as a Tactical Flight Officer. According to TFO Logue, the green laser beam in this case was much brighter than in the past. FPD Pilot Kenneth Schneider also experienced a momentary loss of night vision. Due to the intensity of the green light which illuminated the cockpit, Pilot Schneider had to restrict his field of vision and utilize a wide orbit to avoid further strikes, in order to maintain ultimate control of the aircraft.

7. TFO Logue utilized the Forward Looking Infrared (FLIR) camera which is mounted to the aircraft's belly to determine that the beam originated from the area of North San Pablo and West Fir Avenues in the Pinedale area of Fresno, California. As Air 1 orbited the area of the laser beam, the laser continued to track the aircraft approximately three times.

8. Using the aircraft's FLIR, the FPD officers determined the beam originated from two houses south of West Fir Avenue on the east side of North San Pablo Avenue and contacted dispatch for the assistance of ground units. Response to the laser incident was delayed by an accident involving the first responders. The first responding ground unit was broadsided at the intersection of Blackstone and Herndon Avenues in Fresno and rescue crews had to use the Jaws of Life to remove one of the officers. Both officers were immediately taken to the hospital and treated for serious injuries.

---

[1] All references to dates and times herein are to approximate dates and times.

AFFIDAVIT OF SA SANTIAGO     3

9. The second group of responding officers advised Air 1 that they were at the suspect's location at 7078 North San Pablo Avenue. FPD Officer Nathan Heinrichs contacted the suspect on the porch of what was determined to be his residence at 7078 N. San Pablo Avenue. The suspect was identified as JOHNNY QUENGA. TFO Logue confirmed that QUENGA was the suspect, having had a constant visual on him. A laser pointer was not in plain view.

11. Officer Heinrichs detained QUENGA for the purpose of conducting an investigation of the laser incident. While handcuffing QUENGA, Officer Heinrichs heard FPD radio traffic coming from under QUENGA's sweatshirt pocket. QUENGA consent to a search and, as a result, the officer found QUENGA's cell phone that was playing FPD radio traffic on an app. QUENGA said he could hear everything the officers were saying and knew that they were looking for him and had possibly hidden the laser.

12. When Officer Heinrichs asked QUENGA where his laser pointer was, he said he did not have one. When asked about his understanding of why the police was contacting him, QUENGA stated it was because someone in the house behind him shined a green laser in the air. He also said he would not do anything like that, because he knew he could get in trouble and lose his job over it. It was later determined that QUENGA works a security guard.

13. Following advice and waiver of *Miranda* rights, QUENGA indicated he would like to start over. When asked where the laser was, he said it was inside his house right by the front door and said it was an airsoft rifle. QUENGA then opened the front door and pointed to the rifle which was about 10 inches from the front door leaning against the wall. Officer Heinrichs seized the rifle, which was equipped with a laser, and walked with QUENGA back out to the front of the home. The officer then asked why he had pointed the laser at the police helicopter. QUENGA said it was because he was "dumb" and "just made a bad decision."

AFFIDAVIT OF SA SANTIAGO                                 4

14. Officer Heinrichs seized the airsoft rifle with the attached laser and arrested QUENGA. At the FPD Identification Bureau, QUENGA admitted that the laser belonged to him and that he had purchased it for $65. He said he knew not to point it at people's eyes and admitted that he had pointed it directly at the police helicopter approximately three times.

15. The laser pointer was mounted to the airsoft rifle as depicted below:



16. The laser bears a prominent danger warning in bold green letters against a blue background that states:

> DANGER. Visible and invisible laser radiation. Avoid exposure to beam. Class IIIB laser product.

17. I know based on prior expert testimony that the laser beam emitted from the laser pointer used by QUENGA could not have illuminated the cockpit of Air 1 unless it had directly intersected the cockpit window. Joshua Hadler, a physicist and Chief Laser Safety Officer at the National Institute of Standards and Technology (NIST) and a member of the American National Standards Institute's (ANSI) committee on laser safety, and Dr. Leon McLin, a research optometrist and vision scientist for the Air

Force Research Laboratory and a member of the ANSI committee on laser safety, so testified at the trial of *United States v. Sergio Rodriguez and Jennifer Lorraine Coleman*, Case No. 1:13-CR-109-LJO, involving charges stemming from the lasing of Air 1 on a previous occasion.

18. I also know based on the testimony of Physicist Hadler that a Class IIIb laser "goes up to 500 milliwatts, and is considered to be potentially hazardous or injurious to the eye for a direct beam or reflected beam for even a momentary exposure."

### E. Conclusion

Based upon the foregoing, I respectfully submit that there is probable cause to believe that JOHNNY QUENGA did knowingly and intentionally attempt to willfully interfere with or disable, with reckless disregard for the safety of human life, anyone person engaged in the authorized operation of Air 1, a Fresno Police Department helicopter, and did knowingly aim the beam of a laser pointer at an aircraft or its flight path, in violation of Title 18, United States Code, Sections 32(a)(5), (a)(8), and 39A.

Your affiant swears under penalty of perjury that the facts presented herein are true and accurate to the best of my knowledge.

_____
JOHNNIE R. SANTIAGO
Special Agent,
Federal Bureau of Investigation

SWORN TO BEFORE ME, AND SUBSCRIBED
IN MY PRESENCE THIS ___6___ DAY OF
MARCH, 2015.

_____
BARBARA A. McAULIFFE
United States Magistrate Judge

Reviewed and Approved as to Form
This 6th Day of March, 2015

/s/ Karen A. Escobar
KAREN A. ESCOBAR
Assistant U.S. Attorney